JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiff, KB Capital, the successor in interest to Pure Tech ("Pure Tech"), appeals the unanimous jury verdict in favor of defendant, the I-X Center. Pure Tech alleged that the I-X Center negligently included PCBs in a waste shipment handled by Northwest Chemical Company ("NEC"), a company that treated, stored, and disposed of waste.[1] NEC subsequently shipped the material to Pure Tech, a business that accepted waste liquids.
 {¶ 2} In the spring of 1999, the staff at the I-X Center engaged in an off-season cleaning project. This cleanup resulted in eleven 55-gallon drums of liquid waste, as well as several smaller containers of liquid waste. In June, the representative from NEC tested each of the 55-gallon drums. He visually inspected the smaller containers and determined that they contained paint and paint thinner. The representative then instructed a worker at the I-X Center to consolidate the smaller containers into the larger ones; he specifically indicated which smaller containers should be added to which 55-gallon drums.
 {¶ 3} This worker testified that after the NEC representative had taken samples from the drums, he consolidated the smaller containers into the appropriate 55-gallon drums in accordance with the representative's instructions. On August 8th, a little over a month after the drums had been sampled and NEC had completed its analysis of the waste, NEC notified the I-X Center that it would accept the waste. NEC subsequently picked up the waste on August 19, 1999. The next day, NEC took receipt samples from the drums and compared the physical characteristics to the information obtained in the June samples. The receipt samples were consistent with the information obtained in the June samples; both samples in question were thin, clear, green liquids without any layers. NEC did not perform a chemical analysis of the receipt samples when it accepted the shipment in August.
 {¶ 4} On August 31, 1999, NEC combined the eleven 55-gallon drums from the I-X Center with waste material from other NEC customers and delivered a tanker of 4,700 gallons of waste oil and water, the combined total of 95 drums to Pure Tech. Upon receipt of this tanker load, Pure Tech took samples and determined that it contained 30% oil and 70% water.
 {¶ 5} Pure Tech was in the business of separating oil waste from water and selling the oil for fuel. After it had processed the load from NEC, Pure Tech discovered that the tanker load NEC had sent contained illegally high levels of PCBs. Pure Tech notified NEC of the contamination from its load on Friday, September 3, 1999, but NEC waited until after the three-day Labor Day weekend to investigate the samples it had taken upon receipt of the waste from the I-X Center. In the interim, NEC wrapped the samples with caution tape and a notice that the samples should not be touched. Although no one worked that weekend, NEC's management had access to the lab.
 {¶ 6} When it began testing the samples, NEC determined that one of the samples from the I-X Center contained large amounts of PCBs. The appearance of this sample now showed that it had two distinct layers: a clear, thin, green liquid layer on top and a dark, thick oily layer on the bottom. The initial visual examination in June before NEC accepted the shipment of liquid waste from the I-X Center, as well as the visual examination of it upon receipt at NEC in August, however, showed that it had contained only the thin, clear, green liquid. Additionally, the samples from two of the drums included in the tanker load were missing and, therefore, were not tested.
 {¶ 7} An independent analysis of the sample with the dark oily layer showed that it contained large amounts of PCBs. Because the PCBs had been processed through the equipment at Pure Tech, Pure Tech had to shut down its business and engage in a costly clean up of its plant. Pure Tech sued both NEC and the I-X Center for its damages, including a fraud claim.
 {¶ 8} The jury found unanimously in favor of the I-X Center. Pure Tech filed motions for JNOV and a new trial, both of which were denied by the trial court. This appeal ensued.
 {¶ 9} Pure Tech states two assignments of error, the first of which is:
THE JURY VERDICT AND THE JUDGMENT BASED ON THAT VERDICT ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE. THIS ERROR IS REFLECTED IN THE VERDICT OF THE JURY FOR THE DEFENDANT. THERE ARE TWO DOCKET ENTRIES THAT REFLECT THIS, BOTH ON JUNE 17, 2005, VOLUME 3349, PAGES 943 AND 944.
 {¶ 10} Pure Tech claims that the jury verdict was against the manifest weight of the evidence. When considering the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence in support of the verdict was legally sufficient. State v. Thompkins (1997), 78 Ohio St.3d 380, 387,678 N.E.2D 541, 545-546. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `"`thirteenth juror'"' and disagrees with the factfinder's resolution of the conflicting testimony." Id., citing Tibbs v.Florida (1982) 457 U.S. 31, at 42. In a challenge to the manifest weight of the evidence, a court reviews the record, "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflict in the evidence, the jury clearly lost its way * * *."Thompkins, 387.
 {¶ 11} This court further "delineated the following factors as guidelines or considerations" for a reviewing court "to take into account when weighing the evidence": 1) that a reviewing court is not required to accept as true the incredible, 2) "whether evidence is uncontradicted", 3) "whether a witness was impeached", 4) what was not proved, 5) "the certainty of the evidence", 6) "the reliability of the evidence", 7) whether a witness' testimony is self-serving, 8) whether the evidence "is vague, uncertain, conflicting, fragmentary, or not fitting together in a logical pattern." State v. Mattison (1985),23 Ohio App.3d 10, 14, citing State v. Gaston (Jan. 11, 1979), Cuyahoga App. No. 37846.
 {¶ 12} In support of its claim that the verdict was against the manifest weight of the evidence, Pure Tech points to two undisputed facts: first, the tanker load from NEC contaminated Pure Tech's facility, and, second, the I-X Center had a "cradle to grave" duty to accurately identify and secure hazardous waste. Pure Tech's third claim under this assignment of error, which is disputed, states that the I-X Center breached the duties owed to Pure Tech.[2]
 Alleged Contamination at the I-X Center: Mixing Of The Drums {¶ 13} At the center of the dispute between Pure Tech and the I-X Center is the source of the PCBs found in the NEC tanker. Pure Tech asserts that it has proven that the source of the contamination was the I-X Center. It cites several alternative scenarios for contamination on I-X Center property prior to the delivery of the barrels to NEC.
 {¶ 14} First, Pure Tech claims that the I-X Center misrepresented the contents of the 55-gallon drums that it sent to NEC, because "the material sent to NEC was not the same material as represented by the Waste Profile signed by the IX Center in June 1999." Appellant's brief at 23. In support of this claim, Pure Tech cites to testimony of an I-X Center employee who had added materials to the drums after they had been sampled by NEC's representative. The employee stated he combined the contents of the smaller containers with the 55-gallon containers.
 {¶ 15} Pure Tech ignores, however, that the employee, as well as the NEC representative, further explained that the NEC representative had expressly directed the employee to combine the contents of the smaller containers into the 55-gallon drums. The employee testified that he very carefully lined up the smaller containers with the 55-gallon drums the representative told him to combine. Pure Tech failed to prove, therefore, that any of the waste material NEC picked up at the I-X Center was other than the material the NEC representative had described in the Waste Profile NEC prepared from its inspection in June.
 Drums Left Unattended At The I-XCenter {¶ 16} Pure Tech also argues that the seven-week period[3] during which the drums sat in the I-X Center's warehouse before they were retrieved by NEC provided an opportunity for PCBs to be introduced into the drums the I-X Center sent to NEC. Pure Tech claims that, because the I-X Center did not put "caution" tape around the drums or label them "do not touch," anyone could have added the contaminated material to them while they sat there.
 {¶ 17} An I-X Center manager testified, however, that the warehouse where the drums were stored was dark and rarely used and that no one would have had reason to be in the area where the drums were stored before NEC picked them up. The manager explained he had placed the drums there because the warehouse was not accessible to the general public and it was out of the way for most employees. Both the manager and the employee testified, furthermore, that several times a day they passed the area where the drums were stored in the warehouse and never saw any sign that the drums had been tampered with.
 Presence Of PCBs at the I-X Center: Fluorescent Ballasts and Transformers {¶ 18} Nonetheless, Pure Tech claims that because the I-X Center had "thousands of pounds of the PCB containing material on site in the Summer of 1999," the I-X Center is the most likely source of the contamination and "there can be no doubt" that the I-X Center added the PCBs from its copious supply of the substance. The testimony of the manager and another employee of the I-X Center, however, showed that most of the material Pure Tech pointed to consisted of fluorescent ballasts, which contain only a small amount of PCBs, and transformers. Further, the testimony showed that the contamination from most of the transformers had actually been removed and disposed of in 1990. In fact, the concentrations of PCBs remaining at the I-X Center were significantly lower than the concentrations found in the tanker sample. The mere presence of PCBs at the I-X Center is not sufficient, therefore, to prove that the I-X Center was the source of the subsequent PCB contamination of the large waste shipment in the tanker.
 {¶ 19} Further, when the drums arrived at NEC, their contents were again sampled and compared to the samples taken at the I-X Center. The physical characteristics of two sets of samples matched: both were clear, thin, green liquid without layers. Although NEC had the opportunity to further test these samples, it did not do so at this time.
 {¶ 20} There is no evidence to support Pure Tech's speculation that someone at the I-X Center added material containing PCB to the drums before they were shipped to NEC. Rather, there is evidence to support the I-X Center's claim that the material, when it arrived at NEC, was identical to the material that NEC had examined in June at the I-X Center.
 Consistency Upon Arrival at NEC Site {¶ 21} The I-X Center's expert witness testified that NEC's own documentation showed that the physical appearance of the samples from the allegedly contaminated drum was the same at the time it was tested in June at the I-X Center as at the time it arrived at NEC's facility, and that this consistency was signed off by two different NEC employees.
 {¶ 22} In both samples there was a single layer of thin, green, clear liquid. After Pure Tech had notified NEC of the PCB contamination, NEC left the samples over the holiday weekend in the lab with caution tape and a do-not-disturb sign. After the long weekend, the sample that had previously consisted of only clear, thin, green liquid now was "a bilayer sample" with visible sediment. Because the samples were consistent over the seven-week period between the testing at the I-X Center and the initial testing at NEC, the obvious discrepency in the second sample taken after the contamination in the tanker load was discovered raises suspicion of foul play. The contamination of a shipment from NEC would have serious consequences on its reputation and therefore its viability as a business. It also put NEC in a position of massive liability for the damages at Pure Tech. Because "cradle to grave" liability exists for any toxic substances, NEC had a strong motivation to trace the source of the contamination, so it could seek reimbursement for the expenses for which it was liable to Pure Tech.
 Incomplete Data from NEC {¶ 23} In addition to the discrepancy between the appearance of the samples, much of the data and samples necessary for a complete investigation in this contamination was lost or disposed of. The samples for two drums were never located for testing. NEC never explained, moreover, its inability to test all the barrels from all sources. The missing barrels certainly prevented NEC from determining whether the only source of PCBs was the 20-gallon barrel it claims came from the I-X Center.
 Handling Procedure at NEC {¶ 24} The expert also noted that NEC's "handling practices were questionable," because NEC labeled the jars with samples in them only on the lids of the jars; as a result, the lids could easily be mixed up and put on the wrong jar. The standard procedure for labeling contents in lab samples, the expert explained, "is to label it permanently on the bottle itself." The expert added that the possibility of a mistake was increased by the fact that NEC was analyzing 90 sample jars in a short period of time.
 {¶ 25} The expert pointed out another substandard practice that could have resulted in a mix-up of the samples: NEC's failure to maintain a chain of custody of the samples. "With these you don't know how they were stored, what temperature, were they outside, did somebody carry them home," the expert said.
 Analysis of Discrepency in Mass Balance {¶ 26} The most serious discrepency the expert discussed, however, was in the "mass balance" of the PCBs. According to NEC's claims, the sample that contained the PCBs came from a 20-gallon barrel originating at the I-X Center. This sample contained a ratio of 32,000 ppm[4] of PCBs.
 {¶ 27} It was NEC's practice to combine liquid waste from several sources into a tanker truck, which was then sent to Pure Tech. NEC alleges that this 20-gallon barrel, which it claims was from the I-X Center, was added to a tanker holding liquid from other barrels from other sources. The tanker contained a total of 1,410 gallons of liquid when NEC delivered it to Pure Tech. Logically, however, even if this 20-gallon barrel had been from the I-X Center, and had been the only source of PCBs in the tanker load, those PCBs would have been diluted by the remainder of the liquid waste in the tanker to approximately 453 ppm.
 {¶ 28} Instead of being diluted to 453 ppm, the tanker load contained an even higher ratio of PCBs than the 20-gallon barrel: a difference between 35,000 ppm in the tanker and 32,000 ppm in the barrel. This obvious discrepency led the expert to conclude that the I-X Center sample, supposedly taken from the 20-gallon barrel, had been spiked with liquid waste from the tanker sample to make it look as though the 20-gallon I-X Center barrel were the source of the PCBs. As the I-X Center notes, "[i]t is scientifically impossible for 20 gallons of oil containing 32,000 ppm PCBs to cause a concentration of 35,000 ppm PCBs in approximately 1,400 gallons of oil in the tanker truck." Appellee's brief at 19. The degree of discrepancy is sharply demonstrated by comparing the weight of PCBs in the tanker to the weight of PCBs in the barrel. The I-X Center's witness calculated that the total weight of the PCBs based on 35,000 ppm in a 20-gallon barrel would be 5.8 pounds. The weight of PCBs in the tanker, however, was calculated to be approximately 157.9 pounds. In other words, the weight of the PCBs in the barrel would be only 3% of the weight of the PCBs in the tanker. Even if the I-X Center's barrel had contained contamination as alleged, it could not, therefore, have been the only, or even the primary, source of PCBs in the tanker. After reviewing the entire record, weighing all the evidence and all reasonable inferences, and considering the credibility of the witnesses, we conclude that the jury's verdict was not against the manifest weight of the evidence. Accordingly, we overrule Pure Tech's first assignment of error.
 {¶ 29} For its second assignment of error, Pure Tech states:
II. THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT AND FOR NEW TRIAL. THIS IS REFLECTED IN A DOCKET ENTRY ON JULY 15, 2005, VOLUME 3367, PAGE 302.
 {¶ 30} Pure Tech relies on the first assignment of error to support its claim that the trial court should have granted its motion for JNOV and ordered a new trial.
The Ohio Supreme Court has clarified the standard an appellate court is to follow when deciding a motion for a new trial:
The question to be answered when a manifest-weight issue is raised is whether "there is substantial evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt." (Emphasis sic.) State v.Getsy (1998), 84 Ohio St.3d 180, 193-194, 1998 Ohio 533,702 N.E.2d 866 citing State v. Eley (1978), 56 Ohio St.2d 169,10 O.O.3d 340, 383 N.E.2d 132, syllabus. In conducting this review, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" State v. Thompkins
(1997), 78 Ohio St.3d 380, 387, 1997 Ohio 52, 678 N.E.2d 541, quoting State v. Martin (1983), 20 Ohio App.2d 172, 175,20 OBR 215, 485 N.E.3d 717. (Emphasis added.)
State v. Leonard (2004), 104 Ohio St.3d 54, 2004-Ohio-6235, ¶81.
 {¶ 31} The Supreme Court further explained: "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Thompkins, at 387, citing Martin,
721. When an appellate court reverses a jury on the manifest weight of the evidence, moreover, the Constitution of Ohio requires the decision to be unanimous. Art. IV, § 3 (B)(3).
 {¶ 32} Pure Tech points out that the jury did not fill out all the questions in the jury questionnaire. It notes, specifically, that the jury did not answer the questions about proximate cause and comparative negligence. Rather, the jury answered only the interrogatory concerning the I-X Center's negligence and found it was not negligent. Pure Tech argues that the court should, therefore, have granted a new trial so these questions could be answered.
 {¶ 33} It is axiomatic that if a party has not been negligent, it cannot be found to have been the proximate cause of the injury. As the Ninth Appellate District stated: `The jury unanimously determined that Appellees were not negligent. Absent a finding of negligence, the jury did not need to engage in an analysis of proximate causation." Callahan v. Akron Gen. Med.Ctr., Summit App. No. 22387, 2005-Ohio-5103, ¶ 16. Thus it was not necessary for the jury to answer interrogatories about proximate cause or comparative negligence, because there was no finding of negligence. More importantly, because appellant ordered only a partial transcript, and the jury instructions are not included in the record before this court, we are not able to review the jury instructions. App.R. 9(B) requires appellant to ensure that the proper portions of the record are filed with the appellate court: "At the time of filing the notice of appeal the appellant, in writing, shall order from the reporter a complete transcript or a transcript of the parts of the proceedings not already on file as the appellant considers necessary for inclusion in the record and file a copy of the order with the clerk." App.R. 9(B). The absence of a complete record, however, precludes our ruling on this issue:
 {¶ 34} "When portions of the transcript necessary for resolution of assigned errors are omitted from the record, the reviewing court has nothing to pass upon and thus, as to those assigned errors, the court has no choice but to presume the validity of the lower court's proceedings, and affirm." Knapp v.Edwards Laboratories (1980), 61 Ohio St.2d 197, 199,15 O.O.3d 218, 400 N.E.2d 384; see, also, Painter and Dennis, Ohio Appellate Practice (2005), Section 4:9 ("If the appellant fails to ensure that the transcript includes all relevant evidence pertaining to the issues raised on appeal, the appellate court will assume that the evidence (omitted from the transcript) supported the trial court's factual findings").
Crane v. Perry County Bd. of Elections (2005),107 Ohio St.3d 287, ¶ 37.
 {¶ 35} We must presume, therefore, that the court properly instructed the jury regarding the use of the interrogatories. Further, none of the interrogatories is included in the file before this court. Again, in the absence of the disputed portion of the record, we will presume regularity on the part of the trial court.
Affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
James J. Sweeney, P.J. and Kenneth A. Rocco, J., concur.
[1] PCBs are a manmade substance used extensively in electric transformers and fluorescent light ballasts because they remain stable at extremely high temperatures. In the 1970s, scientists discovered that PCBs are a potent carcinogen that the body stores in fat. Because they are not excreted by the body, but rather build up and accumulate over the course of a person's lifetime and create a greater cancer risk, the EPA has strictly regulated the disposal of PCBs since the danger they pose was discovered.
[2] Pure Tech states in its brief that "[i]t is uncontroverted that the I-X Center breached the duties owed to Pure Tech." This claim is, in fact, strongly contested by the I-X Center.
[3] This time period was necessary for NEC to run tests on the waste material to determine whether it fit NEC's capacity and content limitations.
[4] The term "ppm" refers to "parts per million."